Filed 4/10/15  P. v. Greene CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH MICHAEL GREENE,<br><br>    Defendant and Appellant. | G049263<br><br>(Super. Ct. No. 12CF2452)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Loleena Ansari, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

## INTRODUCTION

A jury convicted Joseph Michael Greene of one count (count 1) of stalking Jane Doe when there was a restraining order prohibiting such behavior, in violation of Penal Code section 646.9, subdivision (b) (further code references are to the Penal Code). In a prior trial, a jury had convicted Greene of four counts (counts 4 through 8) of disobeying a court order in violation of section 166, subdivision (a)(4). The trial court sentenced Greene to three years in prison.

At the close of the prosecution's case-in-chief, Greene moved for acquittal under count 1 pursuant to section 1118.1. Greene argues the trial court erred in denying the motion because there was no evidence he harbored the specific intent to cause Jane Doe to fear for her safety or the safety of her family. We conclude otherwise and therefore affirm.

## FACTS

Jane Doe lived in Orange County with her parents and brother. In 2008, Greene was involved in an incident with Jane Doe, which resulted in his conviction in 2009 of misdemeanor child annoyance. Jane Doe testified at the trial when she was 12 years old. The court issued a protective order requiring Greene not to take any action to obtain the address or location of Jane Doe or her family members, to have "no personal, electronic, telephonic, or written contact" with Jane Doe, to have no contact with Jane Doe through a third party, and not to come within 100 yards of her.

In March 2012, while the protective order remained in force, Greene mailed three letters to Jane Doe's home address in Orange County. One letter was addressed to Jane Doe, the second to her mother, S.P, and the third to her father. S.P. had never provided her home address to Greene. The letter addressed to Jane Doe was five pages in length and came in an envelope with a Seattle, Washington, postmark.

2

Greene's letter to Jane Doe was written as an apologia on her behalf, in which she admitted having lied about the incident in 2008. The letter expressed the hope that Greene's conviction for child annoyance would be overturned and the protective order removed. Greene wrote: "I hope you all realize that it would be extremely un-American of me to let this conviction stand. When you commit a crime like this, [Jane Doe], in the United States of America, you have to be brought to justice, and you have to get help. The only way to get the truth out, and it is true that I am applying very intentional pressure here, is to get you to tell the truth, with this (relatively) peaceful, and long-distance, missive."

The letter scared S.P., in part because it referred to personal facts that she had never revealed to Greene. She contacted the police and, for safety reasons, informed Jane Doe of the letter and its contents.

On March 19, 2012, Greene telephoned Jane Doe's home. S.P. answered the call. Greene told S.P. he was angry about the 2009 trial and was angry specifically with Jane Doe. He accused Jane Doe of lying in her trial testimony and said, if she did not "make things right," he would go to Jane Doe's house. As soon as the conversation ended, S.P., who did not know where Greene was, locked the doors to the house and her son dialed 911. For safety reasons, S.P. informed Jane Doe of the telephone call from Greene.

Between March 19 and 23, 2012, Greene left six voice mail messages on the family's answering machine. In one message, Greene stated: "Hey. [Jane Doe]. It really sucks what you did to me. . . . Tell the truth please. I mean, tell the truth soon. But I have to come to your house and it's horrible. I don't wanna come to your house and see you people. You were so horrible to me. Can you please save your soul and help me out, and do the right thing? Thanks. . . . This is God talking telling you that you're fucked. Your soul is fucked. Unless you tell the truth, don't you understand that?" In another, he stated: "Hey, it's God. [Jane Doe]'s soul is on the line. This is God. Tell the truth."

The voice mail messages made S.P. fearful. The daily life of Jane Doe's family changed. Jane Doe's brother and a friend began staying up all night to make sure somebody was always guarding the house, and the family installed a security system. S.P. did not know where Greene lived and kept Jane Doe out of school for a period of time for fear he would wait for her there.

Greene telephoned Jane Doe's home again on March 23, 2012, and spoke with S.P. Greene insisted once more that Jane Doe had lied and had done so because she was "so scared" of S.P. He told S.P. that if Jane Doe did not tell the truth, he would get himself arrested and go on a hunger strike in prison. S.P. told Greene: "Obviously, your phone calls are, scaring me, they're scaring my family, and you keep doing it. And she didn't lie." Greene said he "really need[ed]" to talk to Jane Doe "[b]ecause she's the one who's going to tell the truth" and continued to insist Jane Doe had lied and S.P. had committed perjury. His last comment was "[a]nd I'll probably be there within a week or two so I'll see you then."

## DISCUSSION

Greene was charged with and convicted of violating section 646.9, subdivision (b).[1] He contends the trial court erred in denying his motion for acquittal under section 1118.1 because there was insufficient evidence that he intended to place Jane Doe in reasonable fear for her safety or the safety of her family.

---

[1] Section 646.9, subdivisions (a) and (b) state in relevant part: "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . . [¶] (b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years."

In reviewing an order denying a motion under section 1118.1, we determine whether there is any substantial evidence of the existence of each element of the offense charged. (*People v. Trevino* (1985) 39 Cal.3d 667, 695, disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1220-1221.) When, as here, the motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested "as it stood at that point." (*People v. Trevino*, *supra*, at p. 695.)

Intent is rarely susceptible of direct proof and usually must be inferred from all the facts and circumstances. (*People v. Falck* (1997) 52 Cal.App.4th 287, 299 (*Falck*).) Thus, the question is whether the evidence presented by the prosecution supported a reasonable inference that Greene intended to place Jane Doe in reasonable fear for her safety or the safety of her family. We conclude it did.

In March 2012, Greene sent three letters to Jane Doe's house. The letters are, to say the least, creepy and disturbing. In them, Greene accused Jane Doe of lying and stated he was "applying very intentional pressure" to get her to "tell the truth." Greene telephoned Jane Doe's home not less than eight times from March 19 through 23. He spoke with S.P. on March 19, then left six voice mail messages before speaking with S.P. again on March 23. (Cf. *People v. Uecker* (2009) 172 Cal.App.4th 583, 597 ["[I]t can be inferred defendant intended to place [the victim] in reasonable fear for her safety from his persistent phone contacts with her despite her attempts to end them."].) In the March 19 telephone call, Greene told S.P. he was angry at Jane Doe and was coming to their house if she did not "make things right." That sounded like a threat, and S.P. treated it as such.

Greene's six voice mail messages were threatening and scary. He said he was God and Jane Doe was "fucked" unless she told the truth. In the telephone call on March 23, Greene continued to insist Jane Doe had lied, claimed he needed to speak with her, and told S.P. he would be at her house in a week or two. S.P., who, of course, heard

the messages and spoke with Greene, testified: "He sounded crazy. I didn't know what he was going to do except for that he told me he was coming to our house."

Greene argues *People v. Halgren* (1996) 52 Cal.App.4th 1223 (*Halgren*) and *Falck*, *supra*, 52 Cal.App.4th 287, are instructive on the level of evidence sufficient to prove intent under section 646.9. In *Halgren*, *supra*, 52 Cal.App.4th at page 1227, the defendant called the victim and told her, "'[b]itch, you don't know who you are fucking with" and he was going "'to do to you whatever the fuck I want to.'" The defendant then called the victim at her office 25 to 30 times per day every day from October 29 through November 8 and, on November 8, was seen outside the building in which the victim worked. (*Id.* at p. 1228.) That day, the defendant called the victim and told her: "'All I want to do is be close to you. I don't understand your rudeness. Why won't you talk to me? You are going to have to talk to me sometime." (*Ibid.*) When the defendant was arrested, the police found two knives, a small holster, and a rotating light beacon inside his car, and a Swiss army knife and a badge in his pocket. (*Ibid.*)

In *Falck*, *supra*, 52 Cal.App.4th at page 299, the Court of Appeal concluded intent to cause fear in the victim could be inferred from evidence the defendant insisted on maintaining contact with the victim even though she was trying to avoid him, and even though he had been "warned away" by the police, the court, and the victim's husband. (*Ibid.*) The defendant's letters to the victim reflected the defendant's desire to engage in sexual acts with her, including elements of bondage or violence. (*Ibid.*) The defendant sent the victim black roses, referred to their being together for eternity, and referred to his prowess with a rifle. (*Ibid.*)

Greene argues that in this case, unlike *Halgren* and *Falck*, there was no evidence of direct threats of violence made against the victim. We disagree with that characterization of the evidence. From the evidence presented by the prosecution, a reasonable inference could be drawn that Greene intended to place Jane Doe in fear for her safety or the safety of her family.

**DISPOSITION**

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.