Filed 12/23/14  P. v. Valdez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048627 |
| v. | (Super. Ct. No. 11NF2871) |
| ALBERT VALDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Reversed.

Helen S. Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

\*                    \*                    \*

A jury convicted Albert Valdez of attempted voluntary manslaughter (Pen. Code, §§ 664; 192, subd. (a); all further references are to this code), firearm possession by a felon (§ 12021, subd. (a)), and active participation in a criminal street gang (§ 186.22, subd. (a) [street terrorism]). The jury found several penalty enhancements applied, including that Valdez committed the manslaughter and firearm possession offenses for the benefit or in association with a criminal street gang (§ 186.22, subd. (b)) and that he personally used (§ 12022.5, subd. (a)) and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (c), (d)). Valdez correctly argues the trial court erroneously failed to instruct the jury that a mutual combatant or original aggressor has a revived right of self-defense when his adversaries suddenly escalate a nondeadly confrontation to deadly proportions. (*People v. Quach* (2004) 116 Cal.App.4th 294 (*Quach*).) The error requires reversal, and we therefore do not reach Valdez's sentencing claim the trial court erred in imposing the lesser enhanced penalty for his commission of a "serious" gang-related felony to avoid the bar on the firearm use enhancement when the court imposes an enhanced sentence for a "violent" gang-related felony. (See *People v. Rodriguez* (2009) 47 Cal.4th 501.) Given the reversal, we also do not reach Valdez's claim that section 654 bars his enhanced sentence for firearm possession by a felon.

I

FACTUAL AND PROCEDURAL BACKGROUND

On a late September evening in 2011, around 10:00 p.m., several teenage males, including the victim, 19-year-old Itzcoatl Yniguez, and Anselmo Garcia, conversed in Garcia's front yard on Penmar Avenue in La Habra. A black Honda Accord drove slowly past the residence and one of the occupants rolled down a window and displayed a handsign of the All West Coast (AWC) criminal street gang, which Garcia and his friends recognized as a challenge to fight. Garcia and at least one of his companions belonged to AWC's rival, the Monos criminal street gang.

2

Shortly after the Honda drove by, Garcia saw a group of four males walking from a nearby intersection toward his home. Garcia's group, including the victim, stepped out into the street and began walking toward the advancing party, but before they met, several gun shots rang out. No one in Garcia's group had seen a gun displayed. Garcia admitted at least one person in his party carried a stick or pole. On hearing the shots, Yniguez turned to flee but was felled by a shot that traveled through his chest and back; he felt his legs go numb, but made it back to Garcia's house. Garcia had dropped to the street when he heard the shots, then ran to the limping Yniguez. In piercing Yniguez's torso, the bullet perforated his diaphragm, stomach, spleen, and one lung. A second bullet had hit him in the buttocks and fractured his hip. He remained in the hospital more than two weeks.

Police apprehended Valdez after he fled a vehicle stop the next day. He admitted to investigators he fired the shots in the confrontation the night before between the Monos and AWC gangs. He also admitted he had been an AWC gang member since he was "a kid," but claimed he recently had been in trouble with the gang for not associating with them. According to Valdez, he had been drinking at home on the night of the shooting when several AWC members came by to demand he accompany them. When the car stopped after the initial drive-by of Garcia's home, one of Valdez's cohort warned him not to be "a bitch" and to "back us up." Suddenly, someone handed him a gun as a test of sorts because "I don't come around" the gang anymore, and warned him again "not be be a bitch, [to] back 'em up" as Garcia's group approached.

In a colloquy with the interviewing officer, Valdez described the confrontation: "Ofcr: They came to you? They were walking towards you? [¶] Valdez: They ran. [¶] . . . [¶] They had, uh, bats. [¶] Ofcr: Okay. [¶] Valdez: Poles. [¶] Ofcr: Okay. [¶] And rocks. [¶] Ofcr: Okay. [¶] Valdez: And . . . [¶] Ofcr: How many of them were there? [¶] Valdez: Like 15. [¶] . . . [¶] Ofcr: Okay. So, about 20, 25 yards away, they're coming at you with . . . one of them . . . you said one them [has] got a bat

3

or something. [¶] Valdez: They all did. [¶] Ofcr: They all had bats? [¶] Valdez: And poles. [¶] . . . [¶] Ofcr: You heard them shout 'Monos'? They were running at you. They passed the gun to you, go ahead? [¶] Valdez: They gave it to me and *** I'm gonna get fucked up. [¶] Ofcr: Okay. [¶] Valdez: And just, I thought I was gonna get killed. [¶] Ofcr: Okay. [¶] Valdez: 'Cause there was like 15 people just chasing us."

Valdez did not testify at trial. The jury rejected the attempted murder charge based on Yniguez's injuries, and instead convicted Valdez as noted. The trial court sentenced Valdez to 20 years six months in prison, consisting of the upper term of 5 years and six months for attempted voluntary manslaughter, and consecutive five-year and 10-year terms, respectively, for the gang enhancement and firearm enhancement.

## II

## DISCUSSION

As this court explained in *Quach*, *supra*, 116 Cal.App.4th at p. 301, the Penal Code provides that while an initial aggressor or a person who has chosen to engage in mutual combat ordinarily forfeits his or her right to assert self-defense as an answer to criminal charges, a "good faith" exception restores the right when certain criteria are met. (§ 197.) The statute states the defendant must "really and in good faith . . . endeavor[] to decline any further struggle before the homicide was committed" (*ibid.*), which *Quach* noted has "transmogrified" in standard jury instructions to a three-part requirement that the defendant: one, "actually and in good faith tried to stop fighting," two, "indicated by word or by conduct to his opponent . . . that he wanted to stop fighting and that he had stopped fighting," and three, "gave his opponent a chance to stop fighting." (CALCRIM No. 3471; *Quach*, *supra*, 116 Cal.App.4th at p. 301 [discussing same requirements in former CALJIC No. 5.56.) Based on the evidence AWC's initial drive-by prompted the later street confrontation between Valdez's group and Garcia's, the trial court instructed the jury with CALCRIM No. 3471 on mutual combat and the qualified right to regain a viable self-defense claim.

4

*Quach* explained that the qualifications on regaining the right are themselves qualified by necessity when the original victim or mutual combatant in a nondeadly fray responds in a manner "'*so sudden and perilous*'" that the defendant cannot safely pause to meet the three-part test without endangering his life. (*Quach*, *supra*, 116 Cal.App.4th at pp. 301-303, italics added.) Thus, "[w]here the counter assault is so sudden and perilous that no opportunity be given to decline further to fight and he cannot retreat with safety he is justified in slaying in self-defense.'" (*Id.* at p. 303, quoting *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201.) After *Quach*, this qualification is now correctly embodied in CALCRIM No. 3471, as follows: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to stop fighting [, or] communicate the desire to stop to the opponent] [, or give the opponent a chance to stop fighting]." (Second brackets in original.) Valdez complains the trial court here erroneously omitted the *Quach* instruction, and he is correct.

The Attorney General does not dispute the trial court's sua sponte obligation to instruct the jury on the principles of law closely connected to the facts of the case, including defenses supported by substantial evidence and not inconsistent with the defendant's case theory. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165.) Here, Valdez asserted self-defense but, as in *Quach*, was hamstrung by the court's instruction "to argue to the jury that a mutual combatant could exercise self-defense [only] if he first withdrew from the fight and informed his opponent of this fact." (*Quach*, *supra*, 116 Cal.App.4th at p. 303.) As in *Quach*, "[t]his was not the defense he was entitled to offer." (*Ibid.*)

The Attorney General suggests no evidence supported an instruction based on *Quach* for two reasons. First, the Attorney General appears to argue a fight has not

5

commenced until the parties have inflicted blows on each other and therefore, until that moment, there is no initial aggression or mutual combat for the original victim to escalate. As she phrases it, "Since there was no evidence of a fight of any kind when appellant used deadly force, there was no substantial evidence supporting the optional paragraph." But an assault is by definition different than battery and therefore does not require physical contact before the factfinder may conclude the confrontation has begun, triggering the right of self-defense. (See, e.g., *People v. Tran* (1996) 47 Cal.App.4th 253, 261 [pursuit while brandishing a deadly weapon constitutes assault with a deadly weapon]; *People v. Reese* (1944) 65 Cal.App.2d 329, 338, 341-345 [no duty-to-withdraw instruction required where the deceased "advanced in a threatening manner, holding a pipe over his shoulder and cursing the defendant and threatening injury"].) The Attorney General's argument is therefore misplaced.

Second, the Attorney General argues Valdez was "not in a position in which he had no opportunity to decline or withdraw" because "he described the victim's group as being 20 to 25 yards down the street when he fired at them." In other words, the Attorney General asserts this distance would require a factfinder as a matter of law to conclude Valdez had the opportunity to withdraw safely, and therefore the *Quach* instruction did not apply.

As noted in *Quach*, however, it is not our province to decide the underlying facts. (*Quach, supra,* 116 Cal.App.4th at p. 302.) Here, it was for the jury to decide whether to credit Valdez's statements to the police and, if so, whether 15 adversaries armed with poles, bats, rocks, and bricks running from across the street at Valdez and his three companions afforded him the opportunity to safely abandon the confrontation and communicate an intent to do so. Valdez suggests on appeal the distance separating the two factions could be closed in a scant four or five seconds, but this too was for the jury to evaluate.

6

It was also for the jury to decide whether the victims' statements that the gunshots came like "fire" without warning supported Valdez's claim he was abruptly handed the gun and that he and his cohort did not display or brandish the weapon or otherwise prompt the victims to escalate the imminent fight by charging with weapons drawn. The error was not harmless because, as in *Quach*, nothing in the trial court's other instructions enabled the jury to "cobble together a correct statement of the law regarding sudden and perilous counter assault." (*Id.* at p. 303.) When the trial court fails to instruct the jury on the applicable law, the appropriate test is whether the error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Quach*, at p. 303.) We cannot say beyond a reasonable doubt that the trial court's failure to instruct the jury under *Quach* on a mutual combatant's potentially revived right of self-defense was harmless.

### III

### DISPOSITION

The judgment is reversed.



ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

7